**Tracy R. GABRIEL v. Brian J. PRITCHARD**

[788 A.2d 1]

No. 00-250

September 26, 2001. Father, Brian Pritchard, appeals the order of the family court suspending indefinitely visitation with his daughter, Briana, and granting sole legal parental rights and responsibilities (PRR) to Briana's mother. Father argues that (1) the court's rulings are not supported by the record, (2) he was not properly noticed for the hearing on mother's motion to modify legal PRR, (3) the court improperly admitted a "past recorded recollection" of mother, and (4) the court abused its discretion when it appointed mother's uncle to supervise father's past visits. We affirm.

Mother and father were living together in Florida at the time of Briana's birth on January 1, 1993. Shortly thereafter, mother moved to Vermont with Briana to live with mother's family, and father remained in Florida. A Florida paternity decree awarded physical custody to mother, granted father visitation, and awarded joint legal PRR.[1] Father did not exercise visitation regularly at first under the Florida order. Father then moved to Massachusetts in August or September of 1994, at which time he began visiting with Briana regularly for a period of several months. A pattern developed, however, in which father would schedule visitation and then would make changes when the visit approached. Briana then began resisting his visitation.

Father's last visit during this period occurred in March 1995 when he absconded with Briana following an

---

[1] The actual order appears nowhere in the record; rather the family court characterized the Florida decree as such.

argument with mother, forcing mother to call the police. Father then returned to Florida in August 1995, but mother did not become aware of this until December of that year. Between March 1995 and July 1996, father did not have any contact with Briana, with the exception of a Halloween card he sent. Mother sought to modify the portion of the Florida decree governing parent-child contact. While the action was pending, the family court entered a temporary order setting up supervised visitation. In a final order dated July 18, 1996, the court modified father's contact schedule with Briana, gradually increasing visitation to allow Briana to readjust to contact with her father and ultimately reestablishing the schedule set forth in the Florida court order.

Only one day of visitation took place under the court's July 1996 order. Because of the prior incident involving the police, mother's uncle was present at the drop-off following this visit. Mother's uncle is a former police officer and volunteers as a guardian ad litem with the Windham Family Court. According to uncle, father would not at first bring Briana inside, and when he did finally, he stood at the end of the hallway with the crying child in his arms, goading mother with questions about whether she really wanted Briana back. Briana was having trouble breathing because father was squeezing her so hard, and he did not let go until uncle approached him, at which time Briana ran to her mother. Mother did not bring Briana back the next day for visitation because of this incident.

Mother testified that in the months following this isolated visit father called her several times and left messages, but he did not leave a phone number where he could be reached and did not mention that he was interested in visitation. Mother also indicated that father did not make any contact during Christmas or on Briana's birthdays. They did receive a box of toys before Christmas of 1996, but there was no note or return address with the package. Mother sent two certified letters to father regarding visitation, both of which went unclaimed. Mother indicated that Briana did not ask about her father during this period of no contact.

Following this period of two and a half years, father contacted mother's attorney on April 5, 1999, indicating that he would be coming to Vermont to collect Briana for seven days of overnight visitation starting on April 12. In response, mother filed a motion on April 7 for an emergency, ex parte order modifying visitation. The family court granted the motion, ordering that father have only supervised visitation for several hours a day for the seven-day period. The court subsequently held a hearing on April 13 at which both parties were present.

After the hearing, the court established a temporary schedule for monthly supervised visitation and weekly telephone contact for Briana and her father, and appointed mother's uncle to supervise visits. The court noted both at the hearing and in its order that father's failure to maintain contact with Briana as established by the court's temporary order could result in suspension of his parent-child contact.

Another hearing took place on December 13, 1999. Father was now living in Cheyenne, Wyoming.[2] Mother stated that Briana had developed behavioral problems leading up to and following the monthly visitation with her father, including having bathroom accidents,

---

[2] Father had testified at the April hearing that he had numerous addresses and was on the road most of each month for his job. Specifically, he noted that he maintained a Florida driver's license listing his sister's address, but was renting a room at an address in Fort Collins, Colorado. He also had a mailing service in Aurora, Colorado and maintained an office in Brigham City, Utah.

becoming withdrawn and at other times becoming violent. Mother also testified that father did not use all of his available visitation days, including not showing up for three days of visitation he had scheduled in October without calling ahead to cancel and canceling his July and November visitation. With respect to the telephone contact, mother testified that father called only seven times. Briana spoke with him the first time he called, but thereafter refused to speak with him. Mother indicated that the phone calls were sporadic and did not always come on time.

Mother also testified that she had made all decisions regarding Briana's health and welfare since she left Florida with her in 1993. She and father could not converse constructively about Briana because father continually, and inappropriately, would turn the conversation to mother and father's previous relationship; therefore, she stopped discussing matters concerning Briana with him.

Uncle also testified, relating his observations made while supervising father's visits with Briana. He chronicled a series of bizarre behaviors by father during the visits, including father incessantly taking pictures of Briana. He described father and Briana's interaction as that of "pursuit and avoidance," with Briana trying to hide from father and often crying when father was pursuing her. Uncle said that he had also witnessed Briana cry and throw tantrums about having to go to visitation.

At the conclusion of the hearing, the family court issued an oral decision in which it determined by clear and convincing evidence that it was not in Briana's best interest that she have continuing contact with father. The court suspended any further parent-child contact and granted mother sole legal PRR. It subsequently issued a written order setting forth in more detail its reasons for doing so. Father now appeals.

Father argues that the court's findings and conclusions resulting in the suspension of his visitation rights are not supported in the record. We will not disturb findings of fact unless they are clearly erroneous. *Nickerson v. Nickerson*, 158 Vt. 85, 88-89, 605 A.2d 1331, 1333 (1992). Therefore, on appeal "our role is limited to determining whether they are supported by credible evidence." *In re D.C.*, 168 Vt. 1, 4, 712 A.2d 902, 904 (1998) (internal quotation marks omitted). Furthermore, "[g]ranting, modifying, or denying visitation is within the discretion of the trial court and will not be reversed unless its discretion was exercised upon unfounded considerations or to an extent clearly unreasonable upon the facts presented." [3] *Gates v. Gates*, 168 Vt. 64, 74, 716 A.2d 794, 801 (1998) (internal quotation marks and citations omitted).

We have noted "[i]t is conceivable that a court could find visitation so inimical to the interests of a child that visitation would be greatly circumscribed or even denied. Indeed, our own cases provide that visitation may be denied upon a showing of good cause." *Fenoff v. Fenoff*, 154 Vt. 450, 452, 578 A.2d 119, 120 (1990); see also *Lane v. Schenck*, 158 Vt. 489, 499, 614 A.2d 786, 791 (1992) ("In contrast to custody cases . . . visitation cases involve only the question of the maintenance of associational ties.") (in-

---

[3] The dissent notes that there is no dispute regarding the applicable standard of review in this case. Indeed, this case appears to be simply another example of the disparate approaches with regard to applying the standard of review in child custody matters that this Court takes. This very issue was addressed at length in the parallel dissents in *Cloutier v. Blowers*, 172 Vt. 450, 456-67, 783 A.2d 961, 966-74 (2001) (Dooley, J., dissenting), and *Spaulding v. Butler*, 172 Vt. 467, 482-93, 782 A.2d 1167, 1179-87 (2001) (Dooley, J., dissenting).

ternal quotation marks and citation omitted). On the other hand, "the suspension or rescission of a noncustodial parent's visitation. rights is a grave matter and one not to be entered into lightly." *Gates*, 168 Vt. at 74, 716 A.2d at 801; see also 15 V.S.A. § 650 (declaring public policy that children be afforded maximum contact with both parents unless "direct physical harm or significant emotional harm to the child . . . is likely to result from such contact"). When a court seeks to suspend indefinitely a parent's right to visitation, due process requires that the court find that it is in the child's best interest by clear and convincing evidence. *Mullin v. Phelps*, 162 Vt. 250, 267, 647 A.2d 714, 724 (1994).

The court based its decision to suspend father's visitation on its findings that father repeatedly failed to establish consistent and sustained contact with Briana, that he failed to. demonstrate genuine concern for Briana's emotional development, and that he has never made efforts to provide appropriate parental support or establish a meaningful relationship with Briana. In so doing, it determined that father's proffered explanations and excuses for his behavior were neither satisfactory nor credible. See *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993) ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence."). Contrary to father's contentions, however, the court did not base its decision *to suspend visitation* on its determinations of father's *credibility*, but rather on his *conduct* and his unsatisfactory explanations for it. The court also determined that father's sporadic contact and inappropriate behavior when he did make contact were causing Briana emotional stress, as well as distress, reflected in her behavior. It concluded that continuing contact with father would be "destructive to her well-being, and antithetical to her best interest."

The record reflects that father did not visit with Briana regularly until she was a year and a half old, and then only for a period of several months. A gap of roughly a year then followed with little or no contact. Father visited with Briana only once, in August of 1996, under the family court's July 1996 order. Father did not have contact again with Briana until April 1999 under the court's emergency order. Finally, father's contact following the court's temporary order of April 1999 continued to be inconsistent, including three days of prearranged visitation missed without notice. Mother testified to drastic changes in Briana's behavior, including bathroom accidents, bouts of violence, periods of withdrawal and extreme emotional distress surrounding the monthly visitation with father. On this record, we cannot say the court's findings lack support.

Father also specifically challenges the court's factual finding that he failed to prosecute a motion to enforce visitation he filed in August 1996 (father concedes that the time to appeal the failure of the court to hold a hearing has long since passed; rather he simply argues that the factual finding is clearly erroneous and should not have played a role in the court's disposition). The record reflects that father filed a motion to enforce the family court's July 1996 order in early August 1996. The family court advised that a hearing could not be scheduled for the week of his motion due to the lack of an available judge. The court indicated, however, that a hearing would be scheduled at the earliest possible date, taking into consideration father's availability. The docket entry made by the clerk regarding this order states:

> I handed [father] the motion/reaction form for his motion for emergency hrg on parent/child contact and asked him when he could be available for a hearing. He stated that he could be

available only this week. I explained that the Judge had written there was no available Court time this week. . . . He tossed the motion reaction form, the motion and affidavit back on the counter and told me to keep it.

Father subsequently filed a notice of appeal from the earlier order of the court asserting jurisdiction over the parties, but never responded regarding his availability for a hearing on his motion to enforce. While his appeal was pending, the trial court clerk sent a letter to father again inquiring about his availability for a hearing on his motion to enforce, also sending a copy to the attorney representing him in his appeal. There was no response to this inquiry either. On this record, we cannot say the trial court's factual finding was clearly erroneous.

Father also argues that the order suspending his parent-child contact is unsupportable in the absence of expert testimony. The court determined it was not needed due to the "patent inadequacies" in father's history of involvement with Briana. Given that expert evaluations in family court proceedings are merely advisory, *Mansfield v. Mansfield*, 167 Vt. 606, 607, 708 A.2d 579, 581 (1998) (mem.), they are not a necessary component for a court to make a determination of the best interests of a child, especially when the record presents little complexity. Cf. *Larson v. Candlish*, 144 Vt. 499, 502, 480 A.2d 417, 418 (1984) (although ordinarily professional standard of care in medical malpractice cases should be established by expert testimony, when violation is apparent, expert testimony is not necessary). The court also noted that father had not sought, nor proffered, an expert evaluation until he submitted his proposed findings after the hearing. Because the court's findings are adequately supported by credible evidence in the

record and its disposition was squarely within its discretion given the facts of this case, we will not undo its suspension of father's parent-child contact.[3]

Father next argues that, because he was not provided sufficient notice of mother's motion to modify legal PRR under V.R.F.P. 4, the court was foreclosed from considering mother's motion. After the final hearing on mother's motion to modify parent-child contact was scheduled for December, mother filed a motion to also modify legal PRR. A copy of the motion was sent to father's attorney. The trial court then attempted to serve father with notice of the motion and the court's order regarding the motion via certified mail. Father, however, refused receipt of the letter, and the court became aware of this the day of the December 13 hearing.[4] Father's attorney stated to the court at the hearing that father did not wish her to represent him on the issue of legal PRR. Rather, her representation was limited to the issue of parent-child contact; therefore, she could not accept service for him. Father was served personally with mother's motion and the court's order in the middle of the hearing.

V.R.F.P. 4(j)(2)(B) and (b)(2)(B) provide that, in cases involving minor children, service of motions to modify PRR may be made either in person or via certified mail, and, if service via certified mail is refused, the clerk may simply effect service by ordinary first class mail.

---

[4] We note that, although the suspension of parent-child contact is indefinite, father may still move to modify the court's order at a later date should father's, mother's or Briana's circumstances change. See 15 V.S.A. § 668.

[5] Father testified that he refuses *all* certified mail and that he did not know that the letter he refused was from the court.

Given that the clerk served notice in person *following* father's refusal of service by certified mail, we cannot say that father was denied due process by the clerk's failure to use the alternative means of ordinary first class mail that is provided in Rule 4. See *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice *reasonably* calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (emphasis added); *Walker v. City of Hutchinson*, 352 U.S. 112, 115 (1956) ("notice required will vary with circumstances and conditions").

Father also contends that the court committed reversible error by admitting a journal mother kept over the duration of the court's temporary order granting father supervised visitation. The court admitted it as a past recorded recollection. To be admissible under Rule 803(5), the witness for whom the recorded recollection is offered must have an insufficient memory such that the witness is unable to testify fully and accurately. V.R.E. 803(5); *State v. Marcy*, 165 Vt. 89, 92, 680 A.2d 76, 78 (1996). Given that mother testified extensively about the substance of matters addressed in the journal and in fact used the journal to refresh her memory, the requirements for the journal's admission under the past recorded recollection exception to the hearsay rule were not met. V.R.E. 803(5). Nevertheless, its admission was harmless error given that mother testified extensively on the identical subject matter covered by the journal — because mother used the journal to refresh her memory, her testimony in essence tracked the journal's contents. Cf. *Trombley v. Southwestern Vt. Med. Ctr.*, 169 Vt. 386, 396, 738 A.2d 103, 110 (1999) (no prejudice where excluded evidence was cumulative and duplicative of evidence elicited from other sources). Furthermore, because mother's motion was heard by the court as opposed to a jury, the danger of the journal being given undue weight by virtue of its admission (as opposed to being simply read into the record as required by Rule 803(5)), was minimized. See Reporter's Notes, V.R.E. 803 ("The rule allows only the reading of the record to the jury to avoid the danger that undue weight might be given to the document itself.").

Finally, father argues that the court abused its discretion by appointing mother's uncle as supervisor for father's visitation, and, therefore, the court should not have taken into account his testimony regarding his observations during father's visits with Briana. We discern no such abuse of discretion. See *Bissonette v. Gambrel*, 152 Vt. 67, 69-70, 564 A.2d 600, 601 (1989) ("trial judge has a broad discretion in determining what is in the best interests of children") (internal quotation marks and citation omitted). As the court noted, uncle was less than an ideal appointment given that he and father did not have a good relationship, but uncle was well-qualified: he served as a guardian ad litem and had prior experience as a visit supervisor for other parties. Lastly, and again as the court noted, father was a relative stranger to Briana at the time he reinitiated contact with her, and the presence of uncle likely had a beneficial effect for her. In custody matters, "[t]he focus of the court's decision must be the best interest of the child, not equity between the parties." *Id.* at 70, 564 A.2d at 602. Consequently, we cannot say that the court exercised its discretion in a way that was clearly unreasonable. See *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988).

*Affirmed.*

458

**Skoglund, J.,** dissenting. Because I cannot agree that the drastic step of suspension of parent-child contact between father and Briana was warranted in this case, I respectfully dissent. The record does not sufficiently support a determination that continuing contact between father and Briana would be so inimical to the child's best interest that it should be indefinitely terminated. Furthermore, given that the trial court based its suspension of parent-child contact on father's failure to maintain "consistent and nurturing contact" with Briana, I am concerned that we are confronted with what will be in practical effect a *permanent* termination of father's relationship with his daughter. I believe that the trial court's ordering such was not within the bounds of reasonableness in light of the evidence before it, and therefore constituted an abuse of discretion. Thus, I would reverse and remand for reconsideration of the numerous and less drastic alternatives to this disposition.

I take no issue with the Court's recitation of the relevant standards of review, but disagree with their application in this case. As we have taken pains to point out, a court order which undertakes the significant step of severing a parent-child relationship is a serious matter. *Gates v. Gates,* 168 Vt. 64, 74, 716 A.2d 794, 801 (1998). The Legislature, as a matter of public policy, has adopted a goal of maintaining "maximum continuing physical and emotional contact with both parents" absent some demonstrable and significant threat to the child's emotional well-being. 15 V.S.A. § 650 (also urging continuing maximum contact absent a threat of direct physical harm). We have determined that, when a court in effect terminates contact between a parent and child in the context of divorce, the decision, although discretionary, requires a higher standard of proof. *Mullin v. Phelps,* 162 Vt. 250, 267, 647 A.2d 714, 724 (1994). In other words, such decisions and the record giving rise to them should be the subject of greater scrutiny.

The record in this case reveals that father's contact with Briana has been sporadic over the years. The evidence also demonstrates that father's own life lacks consistency. Furthermore, based on the testimony of mother's uncle, it would appear that father did not handle himself well in the course of his visits with Briana, although this must be put in the context of the fact that the visits were supervised by a relative of mother's with whom father had a very poor relationship. Furthermore, neither father nor Briana has received educational or emotional supports such as those traditionally available to parents and children prior to termination of a parent-child relationship pursuant to 33 V.S.A. §§ 5531 and 5532. As a result, we have no evidence and are left to speculate at how such services would benefit the two. Cf. *In re J.T.,* 166 Vt. 173, 180, 693 A.2d 283, 287 (1997) (noting in case where parents had received parenting skills class, mental health services and marriage counseling, that "[a]ny assistance SRS provides to troubled parents is . . . a factor in determining whether SRS met its burden" in termination cases). Clearly the transition back to regular contact with father had been difficult for Briana after a period of no contact. But this falls short, in my opinion, of the "significant emotional harm" contemplated by § 650 that would preclude ongoing contact between a parent and child. I do not believe that Briana's difficulty adjusting to resumption of contact demonstrates that *continuing* contact with father is so inimical to Briana's best interests that it should be enjoined by a court indefinitely without first making an attempt to get the parties outside help.

The majority points out that father could seek modification of the court's moratorium on contact with his daughter at a later date. While this is true as a matter of law, I fear in this case it is not a

realistic possibility. The trial court grounded its suspension of father's parent-child contact on his inconsistent visitation with Briana. Given that the court has prohibited any *further* contact, it would be impossible for father to demonstrate an improvement or positive change in this circumstance such that the resumption of visitation would be merited. Rather than facilitating a relationship between parent and child, the court's order suspends it *and* simultaneously by its own terms forecloses any future possibility or hope of father's redemption.

In circumstances such as this case presents, there are myriad resolutions available to the court short of terminating the parent-child relationship. The court's concern about the anxiety father's resumption of visitation with Briana provoked in her could have been addressed through counseling. Counseling would be especially helpful here, where the parties have an extremely acrimonious relationship that might stand in the way of mother helping Briana adjust to the reintroduction of her father into her life. Ordering supervision and support by a qualified, *neutral* third party is precisely what the trial court did when faced with similar circumstances in *Fenoff v. Fenoff*, 154 Vt. 450, 578 A.2d 119 (1990). In *Fenoff*, father and son had not visited with one another for three years, in part because son had refused to participate in visitation. *Id.* at 451, 578 A.2d at 120. Son had professed a hatred of his father and harbored a deep animosity toward him; the trial court also found that he was experiencing deep pain over his parents' divorce. *Id.* at 451-52, 578 A.2d at 120. Furthermore, when father had attempted to visit son at mother's home, she had refused to let him in. *Id.* The court constructed an order that allowed for a gradual reestablishment of the parent-child relationship in a safe, therapeutic setting — ordering counseling for both son and father, and

allowing the counselor to determine when son was ready for contact with father. *Id.* at 452, 578 A.2d at 120. An order akin to this would have been well within the bounds of the trial court's discretion, but simply terminating the relationship when faced with such difficult circumstances was not.

Because I do not believe that the facts of this case present the extreme situation where all contact between parent and child should be severed, I would reverse and remand to allow the trial court to craft a less draconian resolution. I am authorized to say that Chief Justice Allen (Ret.) joins in this dissent.