2011 VT 114

## Ann Marie DeSantis v. John E. Pegues

[35 A.3d 152]

No. 10-178

Present: Dooley, Johnson, Skoglund and Burgess, JJ., and Crawford, Supr. J., Specially Assigned

Opinion Filed October 7, 2011

*Pamela Gatos* of *Tepper Dardeck Levins & Gatos, LLP*, Rutland, for Plaintiff-Appellee.

*Alan P. Biederman* of *Biederman Law Office*, Rutland, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Father appeals the family court's denial of his motion to reinstate parent-child contact following a voluntary suspension of such contact due to an allegation of child sexual abuse. We hold that the court's finding of sexual abuse by a preponderance of the evidence was insufficient to support an order effectively terminating father's parental rights. We reverse and remand.

¶ 2. The parties were married in 1991, adopted their daughter in 1996, and separated in July 2004. Mother and daughter stayed in the marital home, and father sought alternate housing, eventually moving into a two-bedroom condominium. The parties worked out an informal visitation schedule during this time, though there was no overnight contact due to mother's concerns about father's drinking.

¶ 3. The separation affected daughter badly: she had nightmares and emotional outbursts with tears and tantrums. Mother wanted daughter to have counseling to address the issues triggered by the separation and eventual divorce. She was also concerned about father's "physical boundary" issues. Starting when daughter was

very young, she and father engaged in lots of physical play. She would climb all over him, and he would tickle her, at times until she fell down laughing and at times to the point of tears. He would grab her ankles, stare into her eyes, and suck her toes, calling them "tasty morsels." He would also kiss her repeatedly, sometimes so much that her cheeks would redden from his beard. Mother believed that, as daughter grew, the kisses became more "soulful" and "passionate." The level of play between the two and its intensity became a source of concern for her. The two played a game where they would kiss one another's bare stomachs, making slurping sounds. Mother explained to daughter that "Daddies and girls don't kiss that way." Toward the end of the marriage, when father was drinking heavily, mother often found him asleep in daughter's room; on one occasion she found him asleep in daughter's bed with his hand on her bare buttocks. Father's condominium had a separate bedroom for daughter that included a long, narrow closet, which he outfitted with a beanbag chair, a sleeping bag, and a place for toys. Mother testified that daughter referred to it as the "secret closet" and said she and father played kissing and tickling games there. At the hearing, daughter testified that she and father played a game called "How naked can you get?" in the closet where father would begin taking his clothes off and then start taking her clothes off. She did not say whether either of them got completely undressed, though she did say it made her feel uncomfortable.

¶ 4. Throughout this time the parties were negotiating parent-child contact. Father still had not had overnight contact. Mother was convinced any contact should be supervised, and father reluctantly agreed. Two of the people who supervised many of daughter's visits with father testified that the visits were uneventful and that the child seemed happy with her father. After one such visit father was coming out of the house with daughter in his arms. Upon seeing mother he began rubbing daughter up and down his pelvis in a slow motion — all the while grinning at mother and making grunting sounds. Mother thought he did it to provoke her.

¶ 5. In August 2004, a month after her parents separated, daughter began therapy with a licensed clinical social worker. The therapist met first with mother and then with father. Mother's chief concern was father having "physical boundary" issues. Father was concerned about his lack of overnight visitation with

daughter. In working with daughter, the therapist saw no sign that daughter did not want to spend time with father. Nor did she see any indication of sexual abuse in the child. Mother ended the therapy after three sessions.

¶ 6. Mother next brought daughter to a licensed psychologist. Daughter visited this psychologist for roughly a year, beginning in December 2004. He first met with mother who informed him that daughter was having difficulty adjusting to the separation and that father had an "overly physical relationship" with the child. He diagnosed daughter as having an adjustment reaction with signs of anxiety and depression. He did not ask daughter any direct questions about sexual abuse. However, daughter described some of the games she and father had played and, based on daughter's description, the psychologist, a mandated reporter for child abuse, made a referral for suspected abuse to the Department for Children and Families (DCF) after the second therapy session. He considered this a "precautionary measure" because he could neither rule out sexual abuse, nor rule it in as a cause for daughter's depression.

¶ 7. In January 2005, mother hired Dr. Hasazi, a recognized expert in the field of forensic psychology, to perform a forensic evaluation, make recommendations, and implement a plan for parent-child contact. He conducted multiple interviews with mother, father, daughter, and others. He met with daughter alone and observed father and daughter in play sessions. He found daughter "consistent in her desire to spend time with her father." He noted themes of separation in daughter's play and found she exhibited anxiety. At a session at father's house, daughter happily showed Dr. Hasazi the "secret closet." He told father to get rid of the secret closet and suggested that father kiss daughter on her cheeks and not her mouth. Dr. Hasazi also recommended father get counseling on boundary issues, which he did.

¶ 8. In May 2005, the parties crafted a stipulation with Dr. Hasazi's input whereby father's contact would proceed from supervised to unsupervised in a gradually expanded manner through five levels. The parties stipulated that Dr. Hasazi would determine whether and when father and daughter were ready for the next level. On May 13, 2005, the court ordered the parent-child contact as set forth in the stipulation.

¶ 9. In July 2005, Dr. Hasazi notified the parties that father was ready to move up to level two — unsupervised, nonovernight

contact. In August, daughter's psychologist wrote to Dr. Hasazi, suggesting father was ignoring the physical boundary restrictions they had agreed upon. Mother testified that, after daughter's second unsupervised visit with father, daughter came home "distraught" and wet her pants, which she had not done in years. The unsupervised visits continued, and mother testified that daughter complained of stomach aches and had nightmares. Meanwhile, Dr. Hasazi asked both parents to submit to a polygraph examination. Father did so, but mother did not. At the hearing, Dr. Hasazi testified he could not form an opinion on whether father had sexually abused daughter.

¶ 10. In October 2005, daughter relayed to mother, through a game of animal-character role-play, how "Father Rabbit had a long hard tail between his legs" and he would "give Little Rabbit medicine that made her sleepy even though she wasn't sick." Daughter then demonstrated how she held and squeezed Father Rabbit's tail. The next day, mother spoke at length about these stories with daughter's psychologist, who then made a second referral to DCF.[1] Some time prior to December 2004, mother noticed some drawings daughter had made.[2] In one drawing a rabbit is frowning; in one a rabbit is crying; in one two rabbits stand with tails touching; in one a large figure stands over a small rabbit that lies on its back on a table. These drawings were admitted into evidence at the hearing.

¶ 11. Also in October 2005, mother received an offer of employment near Rochester, New York, and she decided to accept. The parties modified the visitation stipulation in November 2005 to allow for father's visitation, and mother and daughter moved to New York shortly before Christmas. After the move, daughter told some of mother's family members about the rabbit stories and said she was Little Rabbit. Mother then contacted New York State Child Protective Services (CPS). While the resulting CPS investigation was pending, father had his first visit with daughter scheduled for around New Year's Day. Mother urged Dr. Hasazi to cancel the visit but he declined. She then called the Vermont State Police and asked them to stop the upcoming visit. The detective

---

[1] The record does not disclose the result of either referral to DCF.

[2] The family court found that the pictures were in existence "prior to February, 2006," but that appears to be a mistake. Mother testified credibly that daughter had made several of the pictures before her first visit with the psychologist, which took place in December 2004.

with whom mother spoke agreed to interview daughter but said he would not stop a court-authorized visit in New York.

¶ 12. When father visited, he, his girlfriend and daughter stayed in a motel room. Father slept in one bed, daughter in another bed, and the girlfriend on a roll-out cot. Father had promised to remain clothed. During the night, daughter had a nightmare, and when she awoke, father was standing over her without a shirt on. He quickly apologized and pulled his shirt on. After this incident Dr. Hasazi moved the visits back to supervised nonovernight visits.

¶ 13. The CPS investigation moved forward, and daughter was repeatedly interviewed by multiple investigators, social workers, and psychologists about the nature of father's physical contact with her. She did not report being sexually abused to any of them. In March 2006, mother engaged a licensed clinical social worker, Corey Sorce, and told her about the family's history of visitation conflicts and that daughter had disclosed sexual abuse to mother. Ms. Sorce met with daughter and testified that daughter disclosed sexual abuse by father within the first twenty minutes of their initial session. Based on information gathered from mother and daughter, Ms. Sorce found daughter's report credible and concluded daughter had been sexually abused. She reached this conclusion without obtaining any information from either Dr. Hasazi or daughter's psychologist in Vermont. She contacted CPS to make a formal referral, and she also wrote to Dr. Hasazi about daughter's disclosure of inappropriate touching. Prior to receipt of Ms. Sorce's letter, Dr. Hasazi knew nothing of Ms. Sorce's involvement because mother failed to notify him.

¶ 14. Father continued to have visits with daughter supervised by his sister. Around May 2006, CPS "indicated" Ms. Sorce's referral, meaning that there was "some credible evidence" of abuse, though it was unclear what evidence CPS considered in making its determination. In June 2006, mother brought daughter to Vermont for an interview with the Vermont State Police. Based on the interview, the State Police forwarded a report to the Washington County State's Attorney.

¶ 15. In February 2006, mother had moved to modify the Vermont visitation order in a New York court. That court dismissed the motion for lack of jurisdiction, and mother filed again in Vermont in May and also requested that the court relieve Dr. Hasazi of his oversight role. The court held two days of hearings

on mother's motion in August 2006, after which father, on the advice of counsel and "due to other pending and potential legal proceedings," filed a stipulation for his parent-child contact to be voluntarily suspended. Father reserved to himself the right to petition the court for relief from the suspension on a temporary or permanent basis. The stipulation also specifically stated that father's suspension of visitation "shall in no way have any weight or effect respecting any consideration of parent-child contact, custody, or otherwise." The suspension was meant to "be entirely without prejudice" to father. The court approved the stipulation on August 8, 2006.

¶ 16. On October 19, 2006, father was charged with felony aggravated sexual assault of his daughter. After an eighteen-month investigation, the State dismissed the charges with prejudice. Father moved to dissolve the interim suspension order in July 2008. Mother responded by asking the court to decline jurisdiction in favor of New York. In November 2008, the family court decided that Vermont courts would retain jurisdiction. The court also concluded that even if father had never committed sexual abuse, the allegations of such abuse and the more than two years since father's last visit with daughter required the court to not simply lift the suspension and enforce the November 2005 visitation order, but to view the motion to dissolve as a motion to modify. Accordingly, the court ruled that in approaching the question of renewed contact, it would rely on the best-interests-of-the-child factors laid out in 15 V.S.A. § 665(b). In doing so, the court noted: "Three years is a long time in the life of a child. While the family court case may have lain dormant all this time, the same cannot be said of the child." Father subsequently filed a motion to modify contact.

¶ 17. During the resulting hearing, multiple witnesses testified about the parties' relationship, the allegations of sexual abuse, and the therapy daughter had received throughout. Two experts also testified. Dr. Maggie Bruck, a developmental psychologist and professor at Johns Hopkins University School of Medicine and adjunct faculty member at McGill University, and Dr. Eric Mart, a board-certified forensic psychologist, testified about interview techniques, the suggestibility of children, and fabrication of a child's memory based on the number and form of questions asked by interviewers. Both were critical of Ms. Sorce's interview techniques and her determination of abuse after spending only twenty minutes with daughter.

¶ 18. At the hearing, daughter testified about the rabbit drawings. She explained that the drawings were her way of saying that father was being "disgusting and doing all this like gross stuff to me." When asked what the "gross stuff" was, she replied: "Touch-[ing] me in the wrong places and then lying about it . . . ." She never specified where the "wrong places" were.

¶ 19. Father also testified. He steadfastly denied ever abusing daughter, but admitted to exchanging long kisses on the lips and to kissing her stomach. He posited that daughter was not untruthful in her testimony, but had been brainwashed into believing what she said. He acknowledged that daughter did not currently want to see him, but suggested it might be necessary to "force" her to see him because it would benefit her in the long run.

¶ 20. The court recognized the evidence presented — prolonged kisses, toe-sucking, extended tickling, the games in the secret closet, the rabbit stories and drawings — would not "rise to the criminal 'beyond a reasonable doubt' standard" for a finding of sexual abuse. The court also specifically held that there was not sufficient evidence of abuse to meet the clear and convincing standard required to terminate all parent-child contact, citing to *Mullin v. Phelps*, 162 Vt. 250, 647 A.2d 714 (1994). However, the court concluded that there was sufficient evidence to support a finding of sexual abuse by a preponderance of evidence and then relied on this finding as evidence of "a real, unanticipated and substantial change in circumstances" sufficient to satisfy the threshold to review a modification of contact under 15 V.S.A. § 668.

¶ 21. The court then reviewed the best-interests-of-the-child factors in 15 V.S.A. § 665(b) and found eight of the nine resolved in mother's favor with the other factor not applicable. It found that the effect of abuse on daughter and on her relationship with father was "the most critical factor in this case." The court then conditioned any future contact between father and daughter on "a demonstrated commitment by father to support [daughter] in her own therapy and a willingness to work collaboratively with [daughter]'s therapist to explore a time and a place whereby slow and careful attempts at re-establishing contact can begin." It concluded that in light of the § 665 factors: "it would be contrary to the child's best interest to force this child to have contact with father at this time." The court stated that its decision not to order visitation was "not a termination of parental rights, but based on the child's needs and situation at this time."

¶ 22. Father appeals the court's denial of his motion to dissolve the interim order. He first claims there was insufficient evidence for the court to find he had committed sexual abuse. He next argues the court's order effectively barred any future contact between him and daughter without a finding of sexual abuse by clear and convincing evidence. Finally, he requests that, upon remand, the family court correct its ruling applying the best-interests-of-the-child standard to his motion to dissolve.

¶ 23. Father's first claim attacks the foundation for the family court's finding that he sexually abused daughter. He highlights the fact that the court never attributed any sexual motivation or content to his acts with daughter and suggests that the court improperly relied on daughter's drawings. He further complains that the court made no express linkage between his boundary issues and sexual abuse and that the court could not properly have made such a linkage without expert evidence.

¶ 24. While father, in his brief, challenges the court's "conclusion" of sexual abuse, the determination of sexual abuse in a case like this is a factual finding. See, e.g., *Siegel v. Misch*, 2007 VT 116, ¶¶ 6, 13, 182 Vt. 623, 939 A.2d 1023 (mem.) (affirming family court's finding of sexual abuse as supported by substantial evidence, even though result contrary to earlier DCF finding); *Fournier v. Fournier*, 169 Vt. 600, 603-04, 738 A.2d 98, 103 (1999) (mem.) (declining to reverse family court's finding of sexual abuse by preponderance of evidence rather than clear and convincing evidence because credibility assessment is family court's role); *Mullin*, 162 Vt. at 262-63, 647 A.2d at 721 (concluding that finding of sexual abuse by preponderance of evidence insufficient to terminate parental rights). Though the court may have stated this finding as a conclusion and included it in the "Conclusions of Law" portion of its decision, the labeling and placement of this finding was wrong. The determination that father abused daughter was a factual finding based on the evidence.

¶ 25. What the family court did conclude was that a finding of abuse by a preponderace of the evidence was sufficient to establish the jurisdictional threshold to review modification of contact under § 665(b). See 15 V.S.A. § 668 (premising modification of custody order on showing of "real, substantial and unanticipated change of circumstances"); *Siegel*, 2007 VT 116, ¶ 6 (affirming family court's finding of real, substantial, and unanticipated

change of circumstances sufficient to trigger modification based on finding of sexual abuse). In reviewing father's challenge to this finding, we discern no error.

¶ 26. In looking at a family court's decision regarding parent-child contact, we apply a familiar deferential standard: we do not disturb findings of fact unless they are clearly erroneous, and we uphold the court's legal conclusions if they are supported by the findings. *Miller-Jenkins v. Miller-Jenkins*, 2010 VT 98, ¶ 12, 189 Vt. 518, 12 A.3d 768 (mem.). Such findings are reviewed in a light most favorable to the prevailing party and will not be disturbed absent a showing that "there is no credible evidence to support the finding." *Highgate Assocs. v. Merryfield*, 157 Vt. 313, 315, 597 A.2d 1280, 1281 (1991). Decisions regarding the granting, modifying or denying of parent-child contact lie within the discretion of the family court, and we will not reverse the court's decision "unless its discretion was exercised upon unfounded considerations or to an extent clearly unreasonable upon the facts presented." *Gabriel v. Pritchard*, 173 Vt. 452, 454, 788 A.2d 1, 5 (2001) (mem.) (quotation omitted). Because the family court is in a unique position to assess the credibility of witnesses and weigh evidence, it is entitled to draw all reasonable inferences from the evidence. *Lyddy v. Lyddy*, 173 Vt. 493, 496, 787 A.2d 506, 512 (2001) (mem.).

¶ 27. The record evidence of father's actions with daughter was sufficient to support the court's finding by a preponderance standard that father sexually abused daughter. See *TBH v. Meyer*, 168 Vt. 149, 152, 716 A.2d 31, 33-34 (1998) (noting this Court "will not render a cramped definition of sexually abusive acts" and holding that abuse can properly be inferred from taking nude photographs of minor). Daughter explained that what happened to the rabbits in her stories and drawings happened to her and said that drawing the images was her way of showing that father was being "disgusting and doing all this like gross stuff to me." The "gross stuff" she explained was "[t]ouch[ing] me in the wrong places and then lying about it." See *State v. Cameron*, 168 Vt. 421, 423, 721 A.2d 493, 496 (1998) (affirming defendant's conviction for lewd and lascivious conduct based on victim's testimony that "defendant rubbed her between the legs 'in the front' where 'I go to the bathroom'"). The family court found such testimony "compelling and credible in many respects."

¶ 28. Father admitted to having prolonged kisses with his daughter, often upon the mouth, which mother described as

passionate. While kissing one's child or sucking on toes is certainly not necessarily abuse, the family court could assess the import of such evidence in context and draw reasonable inferences therefrom. Though Ms. Sorce's interview methods with daughter and rapid adoption of daughter's report of abuse were strongly criticized, it was not clearly erroneous for the family court to rely on her factual testimony regarding daughter's disclosure. The court's determination was supported by the evidence and we will not disturb it. See *Fournier*, 169 Vt. at 604, 738 A.2d at 103.

¶ 29. Finally, evidence was presented of daughter's agitation and distress surrounding contact with father after June 2005. Though the psychologists testified that there are many different factors at play in the mental and physical health of any young person — particularly one at the center of so much parental hostility — the family court was free to draw reasonable conclusions from the evidence presented. We cannot say the court erred in finding by a preponderance of the evidence that father sexually abused daughter.

¶ 30. Father next avers that contrary to this Court's precedent, the family court's order effectively barred future parent-child contact without concluding he committed sexual abuse by clear and convincing evidence. To support this claim, he points to the fact that the family court predicated any future contact he may request with daughter on him supporting daughter "in her own therapy and [his] willingness to work collaboratively with [her] therapist to explore a time and a place whereby slow and careful attempts at re-establishing contact can begin." The court imposed these preconditions, father argues, without any evidence that the therapist, Ms. Sorce, or daughter would work with father, or any basis to conclude father will be able to support the therapy provided by Ms. Sorce when there was no evidence presented as to its content. He further argues that the court lacks authority to control the actions of the therapist, whether it remains Ms. Sorce or another professional. We agree and reverse on this point.

¶ 31. The case at the heart of this argument is *Mullin v Phelps*. There, the mother moved to gain custody of the parties' two sons after the father was accused of abusing the boys. The family court transferred custody, which had been with the father for the previous six years, upon a finding of sexual abuse by a preponderance of the evidence, and the court conditioned father's

visitation upon his acknowledgement of the sexual abuse. We affirmed the court's finding of abuse and the resulting transfer of custody, but we reversed the court's visitation order because it "effectively terminated the father's parental rights." *Mullin*, 162 Vt. at 262-63, 647 A.2d at 721. In so doing, we adopted the standard that, as a matter of due process, a court must find evidence of sexual abuse by clear and convincing evidence in order to terminate all contact between a parent and child. *Id.* at 263, 647 A.2d at 721.[3]

¶ 32. The family court here expressly concluded that the evidence presented did not reach the standard required to terminate father's parental rights. In *Mullin* the family court conditioned father's future visitation on his admission of sexual abuse, even though the court believed it unlikely he would ever acknowledge responsibility for the abuse or consent to treatment. *Id.* That, we reasoned, effectively turned the imposition of the condition into a termination, even though the court had held open the possibility of therapeutic visits "at the behest of the children's therapists." *Id.* We likewise denied a mother's request for termination of the father's visitation rights in *Fournier* where the family court had limited him to supervised visitation because it had found sexual abuse supported by a preponderance of the evidence only. 169 Vt. at 604, 738 A.2d at 103.

¶ 33. The family court gave two "clear precondition[s] of contact" requiring that father demonstrate his commitment to support daughter in her therapy and that he work collaboratively with daughter's therapist. No standards were given for father to "demonstrate his commitment." He no longer has an opportunity to demonstrate that he has internalized the lessons learned from his participation in counseling on appropriate boundaries. Beyond that, the authority to approve, or disapprove, of his efforts to "work collaboratively" with daughter's therapist appears to lie with whatever therapist mother chooses. Obviously, the court cannot order any therapist chosen to work collaboratively with father. If Ms. Sorce continues in this role, it is far from clear whether she would ever consider future contact between father and daughter.

¶ 34. Mother suggests that if father's efforts to regain visitation rights are thwarted by mother or Ms. Sorce, he would have

---

[3] The dissent's belief that *Mullin v. Phelps* should be overruled was not raised, briefed, or argued by any party. We do not address this issue.

recourse to the courts. But this is true only if he can meet the jurisdictional threshold of 15 V.S.A. § 668 in showing a real, unanticipated, and substantial change of circumstances. Nothing in the family court's order suggests that father's inability to support daughter's therapy — whatever the cause — would meet the requirements of § 668. Such a structure is the effective equivalent of a termination of rights.

■■ ¶ 35. The Legislature has made clear that after separation or divorce, "it is in the best interests of [the parents'] minor child to have the opportunity for maximum continuing physical and emotional contact with both parents, unless direct physical harm or significant emotional harm to the child . . . is likely to result from such contact." 15 V.S.A. § 650. The family court made no findings that father ever perpetrated abuse on his daughter during supervised, nonovernight visits. Moreover, supervised visitation was the minimum level of contact the parties had stipulated to in the custody order in force before father's voluntary suspension of contact in 2006. It is worth noting that all of the instances the family court relied upon in finding that father sexually abused daughter occurred before the parties stipulated to this order — daughter even told mother her first Little Rabbit story before the parties modified the order in November 2005 to allow father's visitation in New York. Absent a showing by clear and convincing evidence that any visitation would be detrimental to daughter's best interests, *Gabriel*, 173 Vt. at 455, 788 A.2d at 5 (citing *Mullin*, 162 Vt. at 267, 647 A.2d at 724), the court erred by halting all contact between father and daughter.

■ ¶ 36. As we are remanding the case, we briefly address father's request that we clarify the appropriate standard for the family court to apply to father's motion to dissolve the voluntary suspension of parent-child contact. There was no error in the court's application of a best-interests-of-the-child standard to this proceeding for three reasons. First, it is unclear what prejudice father suffered as a result of the imposition of the threshold showing for modification of the visitation order. The family court found a real, substantial, and unanticipated change of circumstances sufficient to provide the court with subject matter jurisdiction, so father met any "burden" foisted upon him. He complains that he now must shoulder the additional burden of proving that visitation is in the best interests of daughter, but as we held

above, absent a conclusion based on clear and convincing evidence that any contact is contrary to daughter's best interests, his right to visit her cannot be entirely terminated. Second, the language of the voluntary suspension order contemplates court action, suspending contact "until further Order of the Court." Nowhere does it suggest that dissolution of the order would be in the hands of the parties or return the parties to status quo ante. Though it is true that the suspension of contact "shall in no way have any weight or effect respecting any consideration of parent-child contact," it was the "issuance of the suspension" — father's choice to suspend visitation — that was meant to be "entirely without prejudice" and not the underlying events giving rise to father's choice to suspend contact or the nearly two years which passed during the suspension.

¶ 37. Finally, contrary to father's contention, the passage of time without any contact, coupled with the allegations of abuse and the effect such allegations had on daughter's wellbeing, required the court to reexamine what level of parent-child contact would most benefit daughter. Though the court's resulting visitation order was in error, its method of arriving at that point was not. See, e.g., *In re Marriage of P.K.A.*, 725 S.W.2d 78, 82 (Mo. Ct. App. 1987) (affirming trial court's modification of father's visitation because, by filing motion for mother's contempt for denying visitation, "father put the issue of child custody before the court and it had jurisdiction to modify his visitation rights"); cf. *Knutsen v. Cegalis*, 2009 VT 110, ¶ 15, 187 Vt. 99, 989 A.2d 1010 (highlighting role of family court in determining best interests of child even when parents agree to custody arrangement, and recognizing that any change in custody requires weighing of child's best interests).

¶ 38. On remand, the court is to consider parent-child contact for father upon such terms and under such conditions as the family court deems necessary and appropriate in the best interest of daughter.[4] See *Mullin*, 162 Vt. at 267, 647 A.2d at 724 ("The interests of the parent alleging sexual abuse [in the children's safety], though important, can be protected by ordering supervised visitation between the parent accused of abuse and the children."); see also *Fournier*, 169 Vt. at 604, 738 A.2d at 103 (noting family court's appropriate restrictions on father's visitation

---

[4] Father conceded at oral argument that it would not be in daughter's best interests to force her to visit with him if she is entirely unwilling to do so.

with child after finding of sexual abuse by preponderance of evidence). This was father's right under the stipulated visitation order in effect before father voluntarily suspended parent-child contact. We expressly do not reimpose that order, but leave it to the parties and the family court to craft a new structure for visitation, one that does not deny father his remaining parental rights.

*Reversed and remanded.*

¶ 39. **Johnson, J.,** concurring. While this Court has demonstrated time and again that it is no slave to the principle of stare decisis, it has also recognized that mere disagreement with how a case was decided — particular one of relatively recent vintage — is not a sufficient basis to deviate from a policy essential to certainty, stability, and predictability in the law. See *State v. Berini*, 167 Vt. 565, 566, 701 A.2d 1055, 1056 (1997) (mem.) ("While not slavish adherents to stare decisis, we generally require more than mere disagreement to overturn a decision, particularly one of such recent vintage." (citation omitted)). The dissenting judge may consider *Mullin v. Phelps*, 162 Vt. 250, 647 A.2d 714 (1994), to have been decided "in error," *post*, ¶ 46, but to advocate its reversal solely because he remains unpersuaded by its reasoning is to invite an endless cycle of decision and reversal should the *next* Court consider the abandonment of *Mullin* to have been "in error," and the Court after that to conclude otherwise. The folly of such an approach is self-evident. Indeed, it is telling here that none of the parties to this appeal has even challenged *Mullin*, thus rendering the point of the dissent even more elusive and inconsequential.

¶ 40. Furthermore, all of the substantive arguments advanced by the dissent were fully considered in *Mullin*, and nothing new or persuasive is offered here to undermine its holding. Thus, the dissent claims that *no* governmental or constitutional interest warrants application of the clear-and-convincing standard of proof in a private custody case regardless of whether the court's visitation order results in a de facto termination of parental rights. As discussed at length in *Mullin*, however, decisions by the U.S. Supreme Court and others strongly suggest that preservation of a noncustodial parent's visitation rights in any context is a constitutionally protected liberty interest requiring clear and convincing evidence before it may be terminated in its entirety.

162 Vt. at 265-67, 647 A.2d at 723-24; see, e.g., *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) (holding that parent's right to raise child may be terminated only upon clear and convincing proof that the child was neglected); *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (concluding that failure to give noncustodial parent notice of adoption proceeding violated due process); see also *Hoversten v. Superior Court*, 88 Cal. Rptr. 2d 197, 200 (Ct. App. 1999) (reaffirming principles that parent's right to visitation in custody dispute is "so basic to the human equation as to be considered a fundamental right" and that "[i]nterference with that right should only be justified by some compelling necessity" (quotations omitted)); *McAlister v. Shaver*, 633 So. 2d 494, 496 (Fla. Dist. Ct. App. 1994) (recognizing that noncustodial parent involved in custody dispute has constitutionally protected inherent right to meaningful relationship with his children); *Johntonny v. Malliski*, 588 N.E.2d 200, 201 (Ohio Ct. App. 1990) (holding that "noncustodial parent's right of visitation with his children is a natural right and should be denied only under extraordinary circumstances" and by "clear and convincing evidence" (quotation omitted)).

¶ 41. The dissent also asserts that, unlike state-sponsored termination proceedings, a custody dispute poses no potential imbalance in the competing parties' resources that might result in a higher risk of error. As we explained in *Mullin*, however, "[t]he accused parent . . . may face a former spouse who will do or say anything to obtain custody or to prevent the other spouse from obtaining custody," so that the risk of error is no less, and in some cases may even exceed, that in a governmental proceeding. 162 Vt. at 266, 647 A.2d at 723. We noted, moreover, that the risk of error may be substantial in a custody dispute, due in part to the often imprecise nature of sexual abuse allegations and the absence of procedural protections otherwise available in state-sponsored termination proceedings, such as assigned counsel and separate adjudicative stages. *Id.* at 266-67, 647 A.2d at 723-24.

¶ 42. The dissent also claims that there is no sound basis to "privilege" one party over another in a custody dispute and further that the *Mullin* rule results in rulings contrary to the best interests of the child. *Post,* ¶ 52. Again, we carefully considered and rejected these claims in *Mullin*. "In the final analysis," we explained, it is the significant "interests of both parents — the potential loss of parent-child contact and the

countervailing concern for the children's safety," that dictate the minimum standard of proof tolerated by due process and that virtually compel the higher standard. 162 Vt. at 267, 647 A.2d at 724. And while the latter interest may be protected in many cases by requiring closely supervised visitation, the accused parent "should not be required to share equally the risk that the court ruled wrongly in deciding whether to terminate parent-child contact." *Id.* As for the state's paramount interest in protecting the welfare of the child, the dissent cites no evidence whatsoever to support its bare assertion that *Mullin* has operated to the detriment of children in general, or that a remand in this case for consideration of a supervised visitation structure would be contrary to the child's best interests.

¶ 43. As Justice Cardozo insightfully instructed, "when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or the social welfare, there should be less hesitation in frank avowal and full abandonment." B. Cardozo, *The Nature of the Judicial Process* 150 (1921). This case presents precisely the opposite scenario. Nothing has appeared over the last seventeen years indicating even remotely that *Mullin* has undermined the public welfare, wrought individual injustice, or impeded the administration of justice. Indeed, not one cogent reason has been produced to abandon a precedent grounded in fundamental due process and the compelling state interest in preserving the relational interests between parents and children. The dissent's call to "reconsider the wisdom" of *Mullin, post,* ¶ 53, thus rings distinctly hollow.

¶ 44. I am authorized to state that Justice Dooley joins this concurrence.

¶ 45. **Crawford, Supr. J.,** Specially Assigned, dissenting. I dissent from the majority decision because I disagree with the application of a clear-and-convincing-evidence standard to family court decisions about parent-child contact in divorce and parentage cases. A higher standard of proof is constitutionally mandated in cases in which the state seeks to deprive an individual of a liberty interest so that the possibility of error is borne more heavily by the state. In disputes over custody and visitation between individuals, however, the higher burden simply shifts the possibility of error from one parent to another. As explained below, because the private interests are equally balanced, there is

no compelling reason that one individual should more heavily bear the burden of error.

¶ 46. In *Mullin v. Phelps*, 162 Vt. 250, 647 A.2d 714 (1994), this Court interpreted the Due Process Clause of the Fourteenth Amendment and Chapter I, Article 10 of the Vermont Constitution to require the family court to make findings of sexual abuse by clear and convincing evidence before parent-child contact can be denied to the noncustodial parent. This ruling, largely unprecedented at the time, extended a decision of the U.S. Supreme Court requiring the higher standard of proof in termination of parental rights cases. See *Santosky v. Kramer*, 455 U.S. 745, 768 (1982) (concluding that in termination cases an equal allocation of risk between parents and the state is "constitutionally intolerable"). Although this Court has continued to enforce this higher standard of proof in cases in which one parent seeks to effectively end the other's parent-child contact, see *Gabriel v. Pritchard*, 173 Vt. 452, 455, 788 A.2d 1, 5 (2001) (mem.) (requiring clear and convincing evidence of the child's best interest before suspending a parent's right to visitation); *Fournier v. Fournier*, 169 Vt. 600, 603-04, 738 A.2d 98, 102-03 (1999) (mem.), I believe *Mullin*'s extension of *Santosky* to private disputes was in error.

¶ 47. In government-initiated proceedings in which the interests of individuals are particularly important, the purpose of requiring proof by clear and convincing evidence as a matter of due process is to move the risk of erroneous findings away from the individual and onto the state. Thus, in addition to cases concerning the termination of parental rights, the state must meet the higher evidentiary standard in cases involving civil commitment, deportation, and naturalization. Few now question the wisdom and constitutional necessity of limiting the police power of the state in these cases by requiring a heightened level of proof.

¶ 48. It is a very different matter, however, to favor the claims of one side over another in a private custody dispute. As the account of the facts provided by the majority reveals, the burden of proof can greatly affect the outcome of a case. The evidence of father's actions, including inappropriate kissing, touching, and partial nudity over the course of many years, supported the trial court's conclusion that it was more likely than not that he had sexually abused his daughter. The trial court was scrupulous in concluding that this evidence, as compelling as it appears in the paper record, fell short of the clear-and-convincing-evidence stan-

dard in much the same way that it evidently fell short of the proof-beyond-a-reasonable-doubt threshold in father's related criminal prosecution.

¶ 49. What constitutional principle requires the family court to order continued visitation in a divorce case when the evidence shows that it is more likely than not that one parent has committed sexual abuse? The three-part test adopted by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), addresses the competing interests in cases initiated by the state which may lead to the deprivation of an individual's liberty or property. There are three factors identified in *Matthews*: "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used"; and the countervailing governmental interest in avoiding additional fiscal and administrative burdens through substitute procedural requirements. *Id.* at 335. The balancing of these factors dictates what types of procedural protections due process requires.

¶ 50. The presence of important private interests is misleading when we seek to apply the constitutional test in a custody case. In *Mathews*, the private interest was the property interest of an individual in continuing to receive Social Security disability benefits. The state had a competing interest at least as strong in terminating the benefits after an individual recovered or returned to work. These interests can be weighed against one another and, if the individual interest is high enough, due process requires the state to meet the higher burden of proof.

¶ 51. In a custody case, there is no state interest to be balanced against private interests. In constitutional terms, the state has not taken any action to deprive an individual of liberty or property because the state is not a party and has no interest. In contrast, both parents have strong interests in the outcome of the case, but these are private interests which cannot be weighed against some competing interest of the state. There is no constitutional basis for deciding that one parent's interest in visitation outweighs the other's interest in safeguarding the child from abuse. In the balancing test required by decisions like *Mathews*, both parents' interests appear on the same side of the ledger and should receive no greater deference or protection.

¶ 52. Finally, the *Mullin* rule is not necessary in Vermont given that the relevant statutes already provide procedural protections

and direct judicial decision-making in custody disputes. The "best interests of the child" are paramount, and the legislation sets out nine factors to guide the court in determining these interests. 15 V.S.A. § 665. Procedural due process is satisfied by a custody hearing in which each parent has an equal opportunity to persuade the court that his or her position on these factors is more likely true. See *In re Smith*, 169 Vt. 162, 172, 730 A.2d 605, 612-13 (1999) ("Where substantial interests exist on both sides, due process demands no more than an equal apportionment of the risk of error, which the preponderance standard accomplishes."). As this case demonstrates, the *Mullin* rule — privileging as it does the evidence of one party over another — results in rulings which are contrary to the best interests of the child.

¶ 53. It is time to reconsider the wisdom of the *Mullin* decision. It arose out of a factual context in which the claims of abuse were highly suspect. The constitutional principle has not found support in the decisions of other states. And, most compellingly, in cases in which a child's word is offered against an adult's, it can result in rulings which favor contact with a probable abuser over safety for children.

¶ 54. For these reasons, I respectfully dissent from the majority opinion. I would affirm the decision of the trial court.