2014 VT 10

## Nathan Paine v. Jaime Buffa

[93 A.3d 90]

No. 13-193

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**

Opinion Filed January 31, 2014

*Jean Anne Kiewel* of *Jean Anne Kiewel, PC*, Brattleboro, for Plaintiff-Appellee.

*Sharon L. Annis* of *Buehler & Annis, PLC*, Brattleboro, for Defendant-Appellant.

¶ 1. **Crawford, J.** Mother appeals the family division's decision to place sole legal parental rights and responsibilities for the parties' two daughters with father. She also appeals the family division's award of a share of the equity in the marital home to father. We affirm.

¶ 2. The parties met in 2002 in Colorado, when father was twenty-two and mother was eighteen, and moved in together shortly afterward. After traveling for about a year, they moved to southern Vermont in 2003. In October 2003 mother's parents, who live in the state of Georgia, financed their daughter's purchase of a home on Paul's Road in Brattleboro. The couple moved into the home and lived there until mother sold it in November 2007. During this time, father worked seasonally at an apple orchard and performed some carpentry work, and mother worked as a waitress and as a clerk at a farm stand. The couple was able to live beyond their limited means through continuing support from mother's parents.

¶ 3. Mother and father grew dissatisfied with the Paul's Road house, particularly due to its thermal inefficiency. In July 2005 mother approached her parents for money to purchase a thirty-two-acre parcel of land on Sunset Lake Road in Brattleboro. Over the next two years, mother and father worked to construct a house on the property, where they intended to live "off the grid" and become self-sufficient homesteaders. Father provided substantial labor, and mother's parents provided money for materials and additional labor. The couple moved into the house in September 2006. Mother was less committed to the homesteading life than father and quickly abandoned her plan to raise sheep and create wool fabric products. After selling the house on Paul's Road in 2007, she deposited the proceeds into her own bank account and used the money to support herself and her family.

¶ 4. Although by all accounts their relationship had been tumultuous and frequently unhappy, the parties decided to marry

in June 2007. Shortly after the wedding, mother discovered she was pregnant with the couple's first daughter, who was born in March 2008. Their second daughter was born in February 2011.

¶ 5. By September 2011, the parties had decided to separate. Father moved out of the marital home but cared for the children there for three to four days a week, including overnights, while mother attended community college in Massachusetts. Father filed for divorce in March 2012, and began to spend his time with the children at a cabin located on his employer's orchard where he lived.

¶ 6. In April 2012, mother moved for an expedited hearing on parent-child contact because she had made plans to relocate with the children to North Carolina. The court denied immediate relief because no emergent circumstances had been demonstrated and the parties had not yet met with the case manager to attempt to develop a parenting plan. Mother then filed an emergency motion claiming that father's insistence on having parent-child contact at his cabin put the children's well-being at immediate risk. The court held an emergency hearing in May. It concluded that the evidence did not support mother's assertions that father's cabin was an unsuitable place to take the children or that the children were actively resisting going to the cabin. It stated that the motion appeared to be driven by mother's desire to gain an early determination of custody so she could move to North Carolina with the children. The court stated that it would award temporary legal custody to father unless the parties stipulated to joint legal parental rights and responsibilities. Shortly thereafter, the court approved a temporary stipulated order under which the parties shared legal and physical responsibilities.

¶ 7. Although she had originally intended to move to North Carolina, by the time of trial mother planned to move to Georgia, where her parents lived. She submitted proposed parenting plans that were premised upon her residing in Georgia and having sole legal responsibilities and shared physical responsibilities for the children. She offered to send the children to visit father in Vermont during school vacation, or to have father move into one of her parents' homes in Georgia so he could see the children more often.

¶ 8. The final hearing was held over several days in February 2013. On the first day of trial, mother and father were served with a complaint filed against them in Georgia by mother's parents

seeking to recover the funds allegedly loaned to the parties for the purchase and improvements of the Sunset Lake Road and Paul's Road properties. The total amount sought was over $700,000.

¶ 9. The court issued its decree of divorce in March 2013. It determined that the parties were nearly equally situated with regard to the statutory factors set forth in 15 V.S.A. § 665(b). However, because mother was "adamant" in her desire to relocate and the court found that it would not be in the best interest of the children to move to Georgia, the court awarded sole legal responsibility to father and shared physical responsibility to both parties. The court found that the house on Sunset Lake Road was the sole significant asset of the marriage and had a fair market value of $350,000. It awarded the home to mother subject to father's equity share of $85,000, which would constitute a lien on the property. The court ordered mother to pay father his equity share within 120 days of the decree. It provided that after 120 days, interest would begin to accrue and father would have the choice of initiating a foreclosure action or moving to compel mother to list the property for sale. The court ordered mother to hold father harmless in the event that her parents secured a judgment against him in the civil action in Georgia. Mother appeals both the custody and property awards.

I.

¶ 10. We first consider mother's challenge to the court's assignment of sole legal rights and responsibilities to father. This Court applies a highly deferential standard of review to decisions of the family court regarding parental rights and responsibilities. *Thompson v. Pafundi*, 2010 VT 80, ¶ 11, 188 Vt. 605, 8 A.3d 476 (mem.). "[W]e do not disturb findings of fact unless they are clearly erroneous, and we uphold the court's legal conclusions if they are supported by the findings." *DeSantis v. Pegues*, 2011 VT 114, ¶ 26, 190 Vt. 457, 35 A.3d 152. "We view the findings in the light most favorable to the prevailing party, and only reverse if the court exercised its discretion upon unfounded considerations or to an extent clearly unreasonable upon the facts presented." *Chickanosky v. Chickanosky*, 2012 VT 52, ¶ 17, 192 Vt. 627, 54 A.3d 162 (mem.) (quotation omitted).

¶ 11. Mother claims that the family court abused its discretion by assigning sole legal custody to father based on her proposed

relocation to Georgia. She claims that the court focused on this factor to the exclusion of the statutory best-interests factors, and ignored her testimony that she would stay in Vermont if that was the only way she would get legal custody.

¶ 12. ■ ■ In making an order of parental rights and responsibilities, the family court's paramount concern is the best interests of the child. *Id.* ¶ 19. Section 665(b) sets forth a nonexclusive list of factors that the court must consider in awarding custody. 15 V.S.A. § 665(b). Although relocation is not specifically listed as a factor, our case law makes clear that the family court should consider a party's proposed relocation when making a final order of parental rights and responsibilities. See *Gazo v. Gazo*, 166 Vt. 434, 441, 697 A.2d 342, 346 (1997) ("In general, we encourage courts to award parental rights and responsibilities in light of a parent's proposed relocation."). In *Gazo* we recognized that where parents are almost equally situated with respect to the statutory factors set forth in § 665(b), the parties' proposed residences can become a dominant factor in the court's decision. *Id.* We held that in such circumstances it was appropriate to give the party who proposes to relocate the choice of specifying the facts upon which the court should base its custody decision. *Id.* at 441-42, 697 A.2d at 346. The party "has the option of telling the court either that (1) she will move, so that any later relocation by [her] consistent with the proposed relocation will not be unanticipated, or (2) she has made no firm decision to move, so that any later relocation by [her] will be unanticipated." *Id.* at 442, 697 A.2d at 346.

¶ 13. ■ Here, mother repeatedly represented to the court prior to and during the trial that she intended to relocate after the divorce. Both of the proposed parenting plans she submitted prior to trial provided that she would live in Georgia with the children, with father living either in Vermont or in Georgia. At trial, mother testified that she had applied to a dental hygiene training program in Georgia, had an offer of a highly paid job through one of her father's business associates, and could live in one of her parents' homes there. She testified that if father moved to the same area, she could arrange for her parents to provide him with a residence at very favorable financial terms. Not until the last day of trial did she state that she would be willing to remain in Vermont if it meant retaining legal custody. Taken as a whole, mother's representations to the court from the outset of the

divorce proceeding until the last day of trial indicated that she intended to leave Vermont. Thus, the family court did not err in concluding that mother had made a firm decision to move and basing its custody decision in part on her anticipated relocation. *Id.*

¶ 14. ■ ■ Furthermore, the family court's decision to assign legal custody to father was supported by its findings. Citing *Hawkes v. Spence*, 2005 VT 57, 178 Vt. 161, 878 A.2d 273, the court stated that "the critical assessment in judging the impact of a proposed relocation is whether the relocation would significantly impair the other parent's ability to continue exercising the rights and responsibilities he had been exercising." The court found that moving the children to Georgia would reduce the father's role previously defined in the temporary custody plan. This finding, coupled with consideration of the quality of the children's adjustment to their current community, see § 665(b)(4), and their established relationships with their father and other local family and friends, led the court to conclude that the proposed relocation would be unduly disruptive for the children. The court also found mother's plans for employment, schooling and free housing at her parents' property in Georgia to be speculative given her previous inability to commit to long-term employment or complete her education, and her parents' lawsuit against her and father. It determined that father should be the parent who would have the right to determine the children's residence, in the expectation that he and they would remain in Vermont.

¶ 15. While mother's proposed relocation was central to the court's consideration, it explicitly considered other statutory factors in reaching its decision. The court determined that both parents were equally situated with regard to providing the children with love, affection, guidance, and material support, and were both reasonably sensitive to the children's developmental needs. However, it found that father was better able and disposed than mother to foster a positive relationship and frequent and continuing contact with the other parent. Accordingly, it determined that sole legal responsibilities should be assigned to father and the parents should continue to share physical responsibilities equally.

¶ 16. ■ Mother argues that the court improperly applied the standard set forth in *Hawkes v. Spence* in making its decision. In

*Hawkes*, we adopted a standard for courts to apply when considering a motion to modify parental rights and responsibilities based on the custodial parent's proposed relocation out of state with the parties' children. 2005 VT 57, ¶ 13. We held that "relocation is a substantial change of circumstances justifying a reexamination of parental rights and responsibilities 'only when the relocation significantly impairs either parent's ability to exercise responsibilities the parent has been exercising or attempting to exercise under the parenting plan.'" *Id.* (quoting ALI Principles of the Law of Family Dissolution § 2.17(1) (2002)). While acknowledging that there is no precise formula for determining when a parent's ability to exercise his or her responsibilities has been impaired, we set forth a nonexclusive list of factors for the family court to consider, including "the amount of custodial responsibility each parent has been exercising and for how long, the distance of the move and its duration, and the availability of alternative visitation arrangements." *Id.* (quotation omitted).

¶ 17. ■■ Mother correctly points out that the family court is not required to find that there has been a change of circumstances in order to make a final determination of parental rights and responsibilities that is different from the determination in a temporary order. See *Thompson*, 2010 VT 80, ¶ 17 (holding that trial court was not required to find substantial change in circumstances before applying statutory best-interests test where mother proposed to relocate prior to final order being issued); see also *Porcaro v. Drop*, 175 Vt. 13, 14, 816 A.2d 1280, 1282 (2002) (affirming decision to transfer custody where trial court proceeded directly to statutory best-interests analysis in crafting final order because existing order was temporary). In that respect, the threshold requirement in *Hawkes* of evidence that the proposed relocation significantly impairs either parent's ability to exercise responsibilities under the existing order does not apply. However, it was not improper for the court to consider the amount of custodial responsibility each party had been exercising under the temporary plan in deciding which parent should exercise legal rights and responsibilities under the final order. See *Thompson*, 2010 VT 80, ¶¶ 2, 8 (discussing factors relevant to family court's transfer of custody to father, including fact that he had been exercising extensive contact with child under temporary order). Modification of a final order to reflect one parent's relocation requires a specific showing of impairment of existing legal or

physical parental responsibilities. *Hawkes*, 2005 VT 57, ¶ 13. In establishing parental rights in the first instance, there is obviously no need to show changed circumstances. As this case demonstrates, however, the court may consider evidence about the effect of the proposed relocation on the parties' temporary parenting arrangement developed prior to the final hearing. The temporary arrangement may be relevant to several of the statutory factors, including the children's adjustment to their present housing, school and community and their relationship with each parent, particularly the primary care provider if there is one. 15 V.S.A. § 665(b)(1), (4), (6).

¶ 18. The trial court's decision to assign legal rights and responsibilities to father is supported by its findings, which in turn are supported by the record evidence. Thus, we cannot say that the court's decision was clearly erroneous. See *Hoover v. Hoover*, 171 Vt. 256, 261-62, 764 A.2d 1192, 1195 (2000) (affirming family court's decision granting sole legal custody to father where the findings on which it based its decision were supported by the record).

## II.

¶ 19. Next, we consider mother's challenge to the court's property award. Mother argues that the court did not have the power to determine that the funds provided to the parties by mother's parents were gifts because that issue was the subject of an unresolved lawsuit in Georgia. She further asserts that it was error to order her to pay $85,000 to father within 120 days of the judgment because it would force her to sell the house and an unresolved problem with the septic system would prevent her from doing so. Finally, she claims that the amount awarded to father was excessive.

¶ 20. Section 751(a) of Title 15 gives the family court jurisdiction to settle divorcing parties' rights to their property. In crafting a property settlement, the court must first define the marital estate, which includes "[a]ll property owned by either or both of the parties, however and whenever acquired." *Id.* Then, the court must equitably divide and assign the property, taking into account all relevant factors including "the value of all property interests, liabilities, and needs of each party." *Id.* § 751(a), (b)(6). The family court has broad discretion in fashioning an equitable award of marital property, and its decision will not be disturbed absent a

showing that the court abused its discretion. *Wade v. Wade*, 2005 VT 72, ¶ 13, 178 Vt. 189, 878 A.2d 303.

¶ 21. Mother argues that the family court erred in the first step by treating the funds provided by her parents for the construction of the marital home and the purchase of the land upon which it was built as gifts rather than loans. As noted above, mother's parents sued the parties in Georgia just prior to trial, seeking to collect the funds they had allegedly loaned to mother over the years. Mother claims that the family court therefore lacked the power to determine that the funds were gifts. Mother argues that when the parties' debt to her parents is properly accounted for, they have zero equity in the marital home.

¶ 22. ▮ The evidence supports the family court's determination that the home on Sunset Lake Road was a marital asset owned entirely by the parties. Title to the home was solely in mother's name. It is undisputed that mother's parents provided the funds to purchase the property as well as substantial additional funding for improvements. However, mother's parents did not require mother or father to execute a promissory note or mortgage, nor did they require father to subject his homestead interest to any repayment obligation. As the family court found, there were none of the ordinary indicia associated with a typical loan and mother's parents never demanded repayment until the divorce was set for a contested trial.[1] Although mother's parents and mother testified that everyone understood at the time of each advance that the money was to be treated as a loan, father disputed that testimony, stating that his attempts to discuss repayment conditions were always brushed aside. The family court concluded that there was no rational way to view the monetary contributions except as gifts, and proceeded to treat the property as a marital asset unencumbered by the claims of mother's parents. The court acted within its discretion in valuing the property in this way. See *Nuse v. Nuse*, 158 Vt. 637, 638, 601 A.2d 985, 986 (1991) (mem.) (holding that family court acted within its discretion in refusing to subtract debt to appellant's mother from value of appellant's home where it found that money provided was more a gift than a loan).

---

[1] Further, mother had deposited the proceeds from the sale of the Paul's Road house into her own bank account and never repaid her parents. The lack of any action by her parents to recover that money until the parties decided to divorce supports the family court's conclusion that the funds were viewed as gifts rather than loans.

¶ 23. We do not agree with mother's argument that in dividing the equity in the marital home, the family court impermissibly adjudicated the rights of nonparties to the action. The family court examined the nature of the parties' contributions to the marriage and their financial arrangements in order to value the marital estate, a matter that is within its jurisdiction. 15 V.S.A. § 751(a). The court acknowledged that mother's parents had a pending collection action against the parties in Georgia, and held that if a Georgia judgment were to issue mother would be required to hold father harmless from its effect. In essence, the court allocated any future judgment against the parties in favor of mother's parents as a debt owed by mother only. By so doing it fulfilled its statutory duty to equitably divide and apportion marital assets and liabilities. *Id.*; see also *Wade*, 2005 VT 72, ¶ 23 (affirming family court's division of parties' debts as within its discretion). Mother's parents remain free to pursue a judgment in Georgia, but ultimate responsibility for that judgment is placed with their daughter.

¶ 24. This case is unlike *DeLeonardis v. Page*, 2010 VT 52, 188 Vt. 94, 998 A.2d 1072, cited by mother. In *DeLeonardis*, we reversed the family court's property settlement where the court failed to take into account the interest held by a nonparty in the marital home. *Id.* ¶ 16. The married couple had purchased a house using funds provided by one of their mothers, who held a one-half interest in the house. The mother was not liable for the mortgage on the house, and the outstanding debt secured by the mortgage exceeded the value of the couple's fifty percent interest in the house. The trial court applied the outstanding debt on the mortgage against the fair market value of the house instead of against the value of the couple's interest in the home. This resulted in a finding that each party had $52,500 in equity when in fact neither had any equity in the home, warranting reversal. *Id.* By contrast, in this case mother holds sole title to the Sunset Lake Road house. There is no mortgage, and mother's parents have no recorded interest in the property. Any legal interest held by mother's parents is largely theoretical at this point. Thus, the trial court did not err in including the house in the marital estate and dividing the equity between the two parties.

¶ 25. Mother also claims that it was unfair for the family court to order her to pay $85,000 to father within 120 days of the divorce decree or risk foreclosure or sale of the house. The family

court has the power to order the sale of the marital home. *Mansfield v. Mansfield,* 167 Vt. 606, 608, 708 A.2d 579, 582 (1998) (mem.); see also *Milligan v. Milligan,* 158 Vt. 436, 440, 613 A.2d 1281, 1284 (1992) (holding that court may order marital property to "be liquidated and immediately reduced to cash when the court finds it necessary, as here, to meet immediate needs"). It also has the power to create a security interest in the marital property on behalf of the party who is not awarded possession to ensure that party receives his or her share of the equity. See *Sumner v. Sumner,* 2004 VT 45, ¶ 9, 176 Vt. 452, 852 A.2d 611 (noting that court may create lien on marital home in divorce decree). We have previously held that "it is not inequitable to require certain mechanisms to ensure that one spouse pay the other a fair share of the equity in [marital] property, and to fashion an order that will accomplish this in a reasonable amount of time." *Mansfield,* 167 Vt. at 608, 708 A.2d at 582 (affirming family court's order that marital home be placed on market at list price of $400,000, with price to be reduced by $10,000 for each ninety-day interval it remained unsold).

¶ 26. ▉▉▉ In this case, the family court found that the marital home was the parties' only valuable asset and that father was entitled to receive a share of the equity in order "to allow him a stake to continue" the task of parenting the parties' children. It accordingly ordered mother to pay father $85,000 within 120 days, after which she would start to accrue interest at twelve percent per year and father could either initiate a foreclosure action or compel mother to list the property for sale. The court's decision fell within its wide discretion to fashion a schedule for distribution of the marital property. *Id.*

¶ 27. ▉▉▉ Mother further claims that the trial court failed to consider that the leach field on the Sunset Lake Road property will require $6,000 in repairs before the home can be sold, and that she cannot pay this amount on her limited income. The record does not support mother's claim. It was by no means clear from her brief testimony on the issue what the nature of the problem with the septic system was, and there is no evidence that it rendered the house unmarketable. Accordingly, this is not a basis for reversal.

¶ 28. ▉▉▉ Finally, mother argues that $85,000 was an excessive award to father, because the value of father's labor in constructing

the marital home was only $40,000. As we have noted in the past, the division of marital property "is not an exact science." *Plante v. Plante*, 148 Vt. 234, 237, 531 A.2d 926, 928 (1987) (quotation omitted). Where the family court explains the rationale for its property division, we will not disturb it on appeal unless the court abused its discretion. *Wade*, 2005 VT 72, ¶ 13. Section 751 provides that the court may consider "all relevant factors" in deciding how to divide a marital estate, including the nonfinancial contributions of the parties as homemakers and their respective merits. 15 V.S.A. § 751(b).

¶ 29. ▮ Here, the court found that the marriage was a short-term marriage and that most of the assets were acquired through mother's parents. However, it noted that mother would likely continue to be supported by her family and her prospects of acquiring additional wealth through inheritance were substantially better than father's. See *Billings v. Billings*, 2011 VT 116, ¶ 23, 190 Vt. 487, 35 A.3d 1030 (holding that 15 V.S.A. § 751(b)(8) permits the court to consider a spouse's possible future inheritance in determining opportunities of each spouse to acquire capital assets and income in the future). It found that father had made significant labor contributions to the home and had also worked to support the family and care for the parties' children during the marriage. The court determined that under the circumstances father was entitled to more than just the value of his labor, but it rejected his proposed award of $150,000 as excessive. It therefore awarded $85,000 to father. This was not an abuse of discretion and we accordingly will not disturb the award on appeal. See *Williams v. Williams*, 158 Vt. 574, 577-78, 613 A.2d 200, 202 (1992) (affirming family court's award of marital home to wife, even though husband had contributed more to value of residence, where court balanced that fact against source and income of parties, need of parties, and nonmonetary contribution of wife as homemaker).

*Affirmed.*

¶ 30. **Robinson, J.**, concurring. The majority addresses the questions presented as framed by the parties, as did the trial court. I have no objection to doing so, see, e.g., *Demarest v. Town of Underhill*, 2013 VT 72, ¶ 2 n.1, 195 Vt. 204, 87 A.3d 439, and concur in the majority's opinion. I write separately to flag an incongruity in the parties' framing of the case in connection with

parental rights and responsibilities lest our decision in this case be understood to have broader implications than intended.

¶ 31. The main issue in this case with respect to parental rights and responsibilities was whether, if mother relocated to Georgia, the children would be moving with her subject to father's rights of parent-child contact or whether, alternatively, they would remain in Vermont with father subject to mother's right to parent-child contact. The proposed parenting plans mother submitted prior to the hearing contemplated an award of physical and legal rights and responsibilities to mother, with considerable parent-child contact for father.[2] Father, in contrast, proposed that physical and legal rights and responsibilities be awarded to him if mother moved to Georgia, or alternatively that physical rights and responsibilities be shared if she stayed in Vermont. Differences in the parties' views about medical care and educational matters were also in the mix, although these were not the dominant issues in the case. The trial court ordered shared physical rights and responsibilities, and assigned legal rights and responsibilities to father.

¶ 32. The focus of the parties' briefing to this Court is the trial court's analysis of the relocation issue. The parties situate this issue under the rubric of legal rights and responsibilities. Like the majority, I believe the trial court's analysis of the impact of mother's proposed relocation was well within its discretion. However, I also believe that the trial court's resolution of that issue lies within its unappealed order for shared physical rights and responsibilities with a fifty-fifty percent division of the children's time. As the trial court recognized in its decision, in the face of such an order, if mother chose to relocate to Georgia, the order concerning the children's schedule would need to be modified "to address the logistics imposed by [mother's] relocation." The court made it clear that its order was predicated on the expectation that

---

[2] In her requests to find, as opposed to the parenting plans she submitted, mother proposed that she be awarded legal rights and responsibilities, that the court expressly recognize the expectation that she would be relocating to Georgia, and that physical rights and responsibility be shared "as it relates to [father's] ability to spend a majority of the time with the children during the summer months and school vacations in the State of Vermont as well as additional contact time with them in Georgia as set forth in the proposed parenting plan." Although mother framed her request as one for shared physical rights and responsibilities, she essentially proposed that the children live with her during the school year, subject to substantial parent-child contact with father.

both parents would reside in Vermont, and that it was skeptical that a relocation of the children with mother to Georgia, if mother proposed to move, would be in the children's best interests. This conclusion, rather than the award of primary legal rights and responsibilities to father, settled the relocation issue.

¶ 33. "Legal responsibility," as opposed to "physical responsibility," means "the rights and responsibilities to determine and control various matters affecting a child's welfare and upbringing, other than routine daily care and control of the child. These matters include but are not limited to education, medical and dental care, religion and travel arrangements." 15 V.S.A. § 664(1)(A). As a consequence, we have considered issues involving specific conflicts relating to many of the major categories of parental decisionmaking within the framework of legal rights and responsibilities. See, e.g., *Shea v. Metcalf*, 167 Vt. 494, 497-500, 712 A.2d 887, 889-91 (1998) (addressing parental differences regarding health care and education through legal rights and responsibilities). On the other hand, where the children live from day to day is a function of physical rights and responsibilities and the associated parent-child contact schedule. See, e.g., *Chase v. Bowen*, 2008 VT 12, ¶¶ 41-42, 183 Vt. 187, 945 A.2d 901 (explaining that splitting legal and physical rights does not run afoul of the statute and that physical responsibilities include providing routine daily care and control of the child).

¶ 34. The reason it is important that we not conflate legal rights and responsibilities with disputes about where, and with whom, children live and spend their time is that courts can and often do award physical rights and responsibilities to the custodial parent, while awarding shared legal rights and responsibilities pursuant to the parties' agreement, or even primary legal rights and responsibilities to the parent who is not assigned physical rights and responsibilities. See, e.g., *Shea*, 167 Vt. at 496, 712 A.2d at 888 (affirming order awarding physical rights and responsibilities to mother and legal decisionmaking relating to education and medical care to father). The kind of cooperation reflected and cultivated by an agreement to share legal rights and responsibilities is generally a good thing, and should be encouraged in appropriate cases. See *Gazo v. Gazo*, 166 Vt. 434, 443, 697 A.2d 342, 347 (1997) (recognizing trial court's "flexibility to fashion an award that keeps both parents involved in decision-making" when such an award is in the best interests of the child).

¶ 35. The kind of shared decisionmaking contemplated by an award of shared legal rights and responsibilities is not incompatible with an award of primary physical rights and responsibilities to one parent or the other. Moreover, cooperating parties can readily engage in that kind of shared decisionmaking across great distances. And, although it would be an unusual case, a noncustodial parent can exercise the decisionmaking authority that accompanies an award of primary legal rights and responsibilities from a distance. Any inference from this decision that an agreement to share legal rights and responsibilities compromises a custodial parent's ability to relocate with the children would be incorrect and unfortunate.